**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 25-mj-176 |
| | : | |
| v. | : | |
| | : | |
| **ANTOINETTE LANE,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Antoinette Lane (hereafter, the "defendant") be detained pending trial, pursuant to 18 U.S.C. § 3142(f)(1)(C) and (f)(2)(A).

On August 21, 2025, a federal grand jury in Washington, D.C. returned an eight-count indictment in case number 25-cr-241 (TJK), charging Thomas Hancock (hereafter, "Hancock") and others, *inter alia*, with conspiring to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine ("PCP") and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv), (b)(1)(A)(vi), and 846.

On August 26, 2025, following a coordinated arrest operation, the defendant, among others, was arrested and charged by criminal complaint with possession with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi). At the defendant's August 27, 2025 initial appearance, the United States requested her pretrial detention pursuant to 18 U.S.C. § 3142(f)(2)(A) and (f)(1)(C), the latter of which triggers a rebuttable presumption that no condition or combination of conditions can protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A).

The United States respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention.

## APPLICABLE LAW

Pursuant to 18 U.S.C. § 3142(e)(3)(A), this defendant faces a rebuttable presumption that no condition or combination of conditions can effectively ensure her appearance in this case and otherwise protect the community.  The United States must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988).  For a detention decision based upon risk of flight, the United States only need prove by a preponderance of the evidence that there is no condition or combination of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986).  Furthermore, at a detention hearing, the United States may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his or her history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).  In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that the defendant's release poses an unmitigable risk to the community's safety, and she further poses a flight risk.

**SUMMARY OF INVESTIGATION**

The indictment in 25-cr-241 (TJK) stems from an investigation into a narcotics trafficking conspiracy in the 2900 block of Knox Place SE.  Through various investigative methods, including court-authorized Title III wiretaps of Hancock's phone (Target Telephone 2, or TT2) from April 30 to May 29, 2025,[1] Hancock was identified as a large-scale, Baltimore-based narcotics trafficker selling bulk quantities of fentanyl and other narcotics to Washington, D.C. redistributors like the defendant.  Hancock's intercepted wire communications revealed the defendant was a tester and redistributor of Hancock's narcotics.

At the conclusion of the investigation, law enforcement executed a coordinated arrest operation on August 26, 2025, resulting in the seizure of 20 firearms; more than two kilograms, in aggregate, of powdered fentanyl, cocaine, and crack cocaine; significant quantities of liquid PCP; and approximately $50,000 were recovered.  Specifically, during the search of the defendant's D.C. residence, law enforcement recovered further indicia of her role as a drug trafficker and redistributor of narcotics, including fentanyl.

**FACTUAL BACKGROUND**

On April 30, 2025, interception of Hancock's TT2 commenced.  Soon thereafter, investigators identified a redistributor and tester of Hancock's fentanyl/heroin, who communicated with Hancock using telephone number 202-578-9477, later identified as the defendant's phone number.

On May 1, 2025, the defendant called Hancock (TT2, Session 58), asking whether he planned to be in D.C. the following day.  She then advised that he needs "manny" to "level this

---

[1] The Honorable Randolph D. Moss authorized the interception of wire communications for TT1, TT2, and TT3, in case numbers 25-wt-01 and 25-wt-02.

stuff out." Law enforcement with experience investigating narcotics trafficking conspiracies inferred that "manny" referred to mannitol, a commonly used cutting agent. During the intercepted call, the defendant further instructed Hancock that isotone would "probably level this stuff out" so "people won't end up in a coma." She asked Hancock whether he was familiar with isotone, Hancock said no, then she explained that his product needed to be leveled out because "it's too much like a sedative right now, it gotta be leveled out." Hancock told the defendant he had to take a drug test and would call her in a bit. In response, the defendant asked Hancock to "put the manny aside for me."

On May 17, 2025, at 5:07 p.m. (TT2, Session 406), the defendant called Hancock to discuss meeting in D.C., and Hancock asked her to call him on WhatsApp. Later that evening, the defendant called Hancock (TT2, Session 414), instructing him to not "talk about shit on that app, that app records conversations." Hancock explained he's averse to talking on open lines, but the defendant reiterated she recently learned that app is not safe for their use either.

On May 20, 2025, at 2:05 p.m., the defendant called Hancock at 2:03 p.m. (TT2, Session 494), to arrange a meeting later that evening. She asked Hancock whether he was still working with the same recipe, and when he affirmed, she told Hancock to "bring her a ½" that's more grounded "because that tar keeps coming back when you try to mash it." Hancock confirmed he understood her request.

Later, at 3:25 p.m., Hancock called the defendant (TT2, Session 500), who asked Hancock to "just give it to her like he's got it." Hancock responded, "it's the dark brown one" that's coming down there. She remarked, "that's not the same recipe from before," recalling having "the white" last time, about two months ago. Hancock asked if it was soft, and the defendant explained "it was powder and had hard chunks in it." Hancock acknowledged knowing what she was referring

4

to. The defendant then commented that he did not previously give her enough base. The defendant asked Hancock to bring her "some of the brown one to check out" as a tester in addition to "14 of the white." Hancock confirmed he would do so. During the same call, Hancock asked the defendant, "yo the girl, she got some bread this time?" The defendant responded that she kicked the girl's door hinges off and forced her to go to the ATM to get the money. The defendant then vented about the "girl" trying to avoid paying the defendant. Hancock and the defendant agreed that is precisely why they avoid serving people they are unfamiliar with. The discussion then shifted to a substance the defendant referred to as "black," which the defendant described as strong, "hard to get around here," and something she usually gets it in places like Louisiana, Georgia, or Kansas. Hancock claimed his people had the substance too. The defendant said she had previously gone to Saigon "in the jungle" to get the substance she called "black," and she recalled people "cooking it up outside and you could get fucked up just smelling it." The defendant described this substance as black in color with a consistency like "chewing gun." Hancock assured the defendant he would talk to someone about the pricing. Towards the end of the call, Hancock and the defendant agreed they should just meet the next day instead of later that same day.

  Ultimately, on May 21, 2025, investigators utilized wire intercepts between TT2 and 202-578-9477 in conjunction with physical surveillance to identify the defendant as the user of 202-578-9477. On May 21, 2025, beginning at approximately 3:02 p.m., Hancock and the defendant discussed (TT2, Session 510) their plan to meet in Washington, D.C. on I Street. On May 21, 2025, investigators physically surveilled the vicinity of 201 I Street Southwest, Washington, D.C., aided by the intercepted TT2 wire communications. As Hancock arrived at 201 I Street SW, the defendant exited 201 I Street SW. Surveilling investigators observed the defendant talking on the phone at times coinciding with intercepted TT2 wire communications with 202-578-9477.

At approximately 6:31 p.m., the defendant entered the front passenger seat of Hancock's known vehicle, a Mercedes S550 bearing Washington, D.C. license plate JF0857. At approximately 6:42 p.m., she exited the vehicle and entered her building 201 I Street SW. Surveillance observed the defendant interacting with the mailbox for her building before entering the building.

At approximately 7:00 p.m. (TT2, Session 522), Hancock, via TT2, received an incoming call from the defendant. During the call, the defendant expressed her confusion about the differences in the product he had given her. The defendant stated, "I'm looking at this shit. I'm like, I, it's no way I can tell the difference in the colors." Hancock explained, "…The two big ones is the same" and he had not brought her "the white" because he thought "one of [her] people did not like it." Hancock asked her to just check out what he did provide her and let him know.

On May 22, 2025, Hancock called the defendant to get her input on the product he provided the day before (TT2, Session 543). The defendant advised that if Hancock could make the tester product a bit stronger, which she herself had tried, she could get an ounce-sale closed for him involving customers from Virginia; the defendant emphasized Hancock needed to "step it up, it's too weak." As for the other product he provided her, the defendant described it as "basically anesthesia" that requires more cutting agent before it is ready for sale. She lectured Hancock, "you need to do some more research on this shit." She again expressed an interest in buying the tester product for herself if he "steps that up" because the customers will want that. This call made clear that, in addition to redistributing and testing Hancock's narcotics, the defendant used some for herself.

Later in the day, at 3:30 p.m., Hancock again called the defendant for feedback (TT2, Session 547). The defendant, in turn, put a user on the phone to relay to Hanock that one of the

6

products knocked out the user. The defendant then took back the phone from the user and scolded Hancock about being careful when selling the substance she described as black tar. Around 5:11 p.m. on May 22, 2025, Hancock called the defendant (TT2, Session 556), who asked Hancock whether he could fly to St. Louis "for a play" for her. Hancock responded that he wanted to meet her to discuss the specifics, but for the time being, even though he recently started a new job, he would plan to fly out there for her. Later that evening, at 8:57 p.m., the defendant called Hancock to discuss the specifics of "the play," but Hancock was at dinner, so he promised to step away so they could talk. The call ended, and no subsequent call came through on TT2, so if the defendant and Hancock reconnected to discuss their plan, it was likely through use of an encrypted app to avoid potential interception.

On May 27, 2025, the defendant called Hancock in the evening to request what he had previously provided her as a tester (TT2, Session 654). Hancock assured the defendant he would strengthen it per her recommendation. The defendant emphasized she wanted it that night as she needed something to keep her up. Hancock later called the defendant at 7:48 p.m. that same evening (TT2, Session 664), advising he had a proposition for her and asking if she was interested in investing in something he was working on. When the defendant asked what it was, Hancock responded he would tell her in person.

The next day, May 28, 2025, Hancock called the defendant, who relayed the product he gave her the day before was too strong and made her sick (TT2, Session 677).

### *August 26, 2025 Arrest Operation*

On August 26, 2025, law enforcement conducted a joint operation to execute arrest warrants, issued pursuant to the above-referenced indictment return, and residential warrants in 20 locations, including the defendant's residence at 201 I Street SW. At the time of the search warrant

execution, the defendant, who was approaching the front door, was the only individual present within the residence.  Within her residence, law enforcement found and seized:

- 1.76 grams of fentanyl packaged in five individual ziplock bags, four of which were on one digital scale, the other ziplock bag was on a second digital scale;
- $9,371 in U.S. currency;
- Two digital scales;
- Drug paraphernalia, including both new and used ziplock bags;
- Items with possible drug residue on them; and
- Pictures of identifications and mail matter that included the defendant's name and other identifiers.

On her person in her groin area was a ziplock bag holding 56.44 grams of a white powdery substance, which field-tested positive for fentanyl.

## ARGUMENT

Due to the charged offense, the defendant is presumptively dangerous under Section 3142(e)(3)(A).  Moreover, given her criminal history, including the issuance of multiple bench warrants, the Defendant presents a flight risk.  The United States respectfully submits the defendant cannot rebut the presumption in favor of her detention, and there are no conditions of release adequate to reasonably assure the community's safety and her return to Court.  Therefore, this Court should detain the defendant pending trial.

A. **The Nature and Circumstances of the Offense**

The nature and circumstances of the charged offense weighs strongly in favor of detention. As illustrated by the defendant's intercepted communications with Hancock, combined with the seizures from her residence, the defendant is a redistributor of, *inter alia*, fentanyl.

As the Court is well-aware, fentanyl specifically is a potent synthetic opioid approved by the Food and Drug Administration for use as an analgesic (pain relief) and anesthetic. It is approximately 100 times more potent than morphine and 50 times more potent than heroin as an analgesic.[2] As reflected in the statutory mandatory minimums for fentanyl distribution, Congress recognized the danger of this particular drug, which is responsible for a national opioid crisis resulting in a considerable increase in fatalities. The statistics regarding the dangers of fentanyl, and its impact in Washington D.C., are staggering. A report issued by the D.C. Office of the Chief Medical Examiner ("OCME"), dated September 19, 2024, shows opioid-related overdoses increased dramatically from 2014 until 2023. As discussed in the report, in 2023, there were 523 opioid-related fatal overdoses with an average of 43 deaths per month.[3] While the term "opiates" include fentanyl and its analogs, morphine, heroin, and other types of drugs, the OCME also discovered that in 2023, over 96% of these overdose deaths involved fentanyl.[4] Beyond D.C., fentanyl continues to have a devastating impact on the local and national community. According to the Drug Enforcement Administration, "[m]ore than 107,000 people lost their lives to a drug overdose in 2023, with nearly 70 percent of those deaths attributed to opioids such as fentanyl."[5]

Indeed, the gravity of the offense is reflected in the defendant's exposure, under 21 U.S.C. § 841(b)(1)(B)(vi), to a five-year mandatory minimum sentence and up to 40 years in prison.

---

[2] Drug Enforcement Administration, Fentanyl Fact Sheet, https://www.dea.gov/factsheets/fentanyl, (last visited August 28, 2025).

[3] *See* D.C. Office of the Chief Medical Examiner, Opioid-related Fatal Overdoses: January 1, 2018 to June 30, 2024 (September 19, 2024), https://ocme.dc.gov/sites/default/files/dc/sites/ocme/Opioid-Related%20Fatalities_Sep2024.pdf (last visited July 16, 2025).

[4] *Id.*

[5] Drug Enforcement Administration, Overdose Deaths Decline, Fentanyl Threat Looms (December 16, 2024), https://www.dea.gov/press-releases/2024/12/16/overdose-deaths-decline-fentanyl-threat-looms#:~:text=More%20than%20107%2C000%20people%20lost,to%20opioids%20such%20as%20fentanyl. (last visited July 16, 2025).

### B. The Weight of the Evidence

The strength of the evidence against the defendant supports her detention. TT2 intercepted communications captured her unequivocally discussing the production and redistribution of narcotics with Hancock—the lead defendant in 25-cr-241 (TJK), and the upstream supplier of fentanyl and PCP to the codefendants in that case. In that case, Hancock supplied bulk quantities of fentanyl to Eric Prather, a prolific fentanyl and PCP dealer in the 2900 block of Knox Place SE. So, too, here, the defendant's phone calls with Hancock evinced a similar relationship insofar as Hancock provided the defendant with controlled substances that she herself tested, provided feedback on, and ultimately sold to her own customer base.

What's more, the evidence recovered at her residence on August 26, 2025, confirmed the reasonable inference from the intercepted calls that the defendant was far more than a user; she herself was a drug trafficker and redistributor of narcotics, including Hancock's. For this reason, her residence was equipped with multiple scales, fentanyl pre-packaged into zips that were on digital scales, other drug paraphernalia, and crucially, the distribution-quantity of fentanyl that the defendant attempted to conceal on her person before approaching the front door.

### C. The History and Characteristics of the Defendant

The defendant's criminal history reflects that she is both a recidivist and a flight risk. She has multiple convictions involving analogous conduct, although concededly they are dated—to wit, a 1992 Attempt Possession of Heroin, a 2002 misdemeanor possession of cocaine, and a 2008 misdemeanor possession of heroin. Of concern are the defendant's convictions for her noncompliance with Court orders, including a 2008 conviction for Contempt-Condition of Release Violation in D.C. Superior Court case number 2008 CMD 17207 and a Bail Act Violation conviction in D.C. Superior Court case number 1998 CMD 1331. What's more, on six occasions,

10

bench warrants were issued for her failure to appear to court hearings, which animates the United States' concern that the defendant poses a flight risk.

### D. The Danger to the Community

The United States respectfully submits that the defendant poses a danger to the community. The presumption under Section 3142(e)(3)(A) establishes that narcotics trafficking is an "inherently dangerous activity." *See United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (Lamberth, C.J.). The United States respectfully submits that the danger is magnified where, as here, the narcotics trafficked in large quantities is fentanyl.

## CONCLUSION

For the reasons noted above, the United States respectfully submits that no condition or combination of conditions will reasonably assure the safety of the community and the defendant's return to court. Accordingly, the United States respectfully requests that the Court grant the United States' motion to detain the defendant pending trial in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


*/s/*
SITARA WITANACHCHI
MATTHEW W. KINSKEY
JOHN PARRON
D.C. Bar No. 1023007 (Witanachchi)
D.C. Bar No. 1031975 (Kinskey)
PA Bar No. 324503 (Parron)
Assistant United States Attorneys
Violent Crime and Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2025, a copy of the foregoing Memorandum in Support of Pretrial Detention was submitted via CM/ECF, which will transmit to counsel for the above-captioned defendant.

*/s/ Sitara Witanachchi*
Assistant U.S. Attorney